* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rowell and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are subject to the North Carolina Workers' Compensation Act, all parties are properly before the Commission, and the Commission has jurisdiction over the parties and subject matter.
2. Zurich American is the carrier on the risk.
3. Plaintiff was engaged in an employment relationship with defendant-employer on June 2, 2003, the date of the alleged injury by accident.
4. Plaintiff was operating a motor vehicle, which was involved in a one-car accident at approximately 8:19 a.m. on June 2, 2003 on Chatham Street in Sanford, North Carolina. The accident occurred in the course of plaintiff's employment with defendant-employer.
5. Plaintiff has remained out of work since June 2, 2003 and continuing through the date of the Deputy Commissioner's hearing.
6. Plaintiff's average weekly wage at the time of his alleged injury by accident was $152.47, yielding a compensation rate of $101.65 per week.
6. Stipulated Exhibit # 1 is the Pre-Trial agreement, as modified and initialed by the parties.
7. Stipulated Exhibit # 2 is a packet of documents, including medical records, a police report and a photograph of plaintiff's June 2, 2003 motor vehicle accident.
8. The issues before the Full Commission are whether plaintiff sustained an injury by accident arising out of his employment on June 2, 2003 that resulted in subdural hematomas, a stroke in August 2003 and resulting medical problems and disability, and, if so, what benefits he is entitled to receive; and, whether plaintiff's counsel is entitled to attorney's fees under N.C. Gen. Stat. § 97-88 and/or § 97-90(c).
 * * * * * * * * * * *
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the Deputy Commissioner's hearing, plaintiff was 73 years old. On June 2, 2003, plaintiff was involved in a motor vehicle accident in Sanford, North Carolina, while he was working for defendant-employer. Plaintiff worked with defendant-employer, doing business as Car Quest of Sanford, in a part-time capacity for six years. His primary work duties were driving the company pickup truck for deliveries of automotive parts on behalf of defendant-employer.
2. At the time of the accident, plaintiff was driving defendant-employer's pickup truck, which had a Car Quest logo on the side, and was returning to defendant-employer's place of business after making a delivery. Plaintiff suffered a blackout while he was operating the truck, and the truck ran off the street near a railroad crossing, struck a light pole and rolled over. Plaintiff was found at the scene of the accident sitting in the driver's seat, conscious and alert, but complaining of head pain. He was fully immobilized and transported to Central Carolina Hospital.
3. At Central Carolina Hospital, plaintiff underwent a CT scan of his head. The CT scan noted a small focus of increased attenuation adjacent to the superior sylvian fissure, most likely representing a contusion to plaintiff's brain. Plaintiff was diagnosed with a concussion and cerebral contusion secondary to head injury sustained during the motor vehicle accident, which accompanied a sudden loss of consciousness, described in the hospital records as a "syncopal episode." On June 4, 2003, an MRI scan was performed of plaintiff's brain, which noted an acute punctate right cerebellar infarct, or a new stroke. No subdural bleeding or contusion was noted on this MRI. Upon his discharge from the hospital, plaintiff was noted to be awake, alert and oriented with no neurological deficits. He was able to stand and walk without difficulty and no further headaches were noted. Plaintiff was discharged with instructions to not drive and to follow-up with his physician on June 9, 2003. After his discharge from the hospital, plaintiff followed-up with Dr. Steven Michael, an internist, and Dr. Mohan Deochand, a neurologist.
4. On June 12, 2003, Dr. Deochand saw plaintiff, who complained of headaches for the several days following his discharge from the hospital. Dr. Deochand did not note plaintiff had any imbalance problems, shortness of breath, or chest pains. Dr. Deochand diagnosed plaintiff with a right cerebellar infarct secondary to a motor vehicle accident and continued plaintiff on Plavix and aspirin. On June 16, 2003, Dr. Deochand saw plaintiff again for "more bleeding" from his nose, which lasted about 20 minutes. A neurologic exam was normal and Plavix and aspirin were continued. On July 17, 2003, plaintiff returned to Dr. Deochand complaining of a 2-inch bleb of blood in his mouth. Dr. Deochand extracted the blood, ordered that plaintiff cease taking the Plavix and aspirin for two days, but resume them on July 20, 2003. On July 22, 2003, plaintiff saw Dr. Michael at Internal Medicine Associates. Plaintiff told the doctor that he had been experiencing some right facial numbness that had now resolved.
5. On August 2, 2003, plaintiff saw Dr. Deochand for complaints of weakness and pain in his legs, with difficulty walking. He also complained of neck pain radiating into the right side of his head. Dr. Michael saw plaintiff on the morning of August 5, 2003. Plaintiff arrived in a wheel chair, complaining of weakness and reporting that he had developed a headache with nausea on the Wednesday prior to his visit. A neurological exam noted slight decrease in strength in his left upper and lower extremities.
6. Plaintiff was seen at the emergency department at Central Carolina Hospital on August 7, 2003, at approximately 4:00 a.m., complaining of an intense headache in the back of his head that woke him up. Plaintiff arrived at the emergency room using a wheelchair, unable to walk. Plaintiff was seen the next day by Dr. Sangeeta Sawhney at Internal Medicine Associates. Dr. Sawhney admitted plaintiff to the hospital after noting plaintiff's complaints of a "splitting headache" and left-sided weakness with difficulty walking. An MRI scan performed that day showed that plaintiff had bilateral subdural hematomas, or bleeding in the subdural space of the brain, larger on the right than the left. There was significant pressure on the right parietal-frontal brain tissue. The subdural hematomas appeared to be subacute in nature, but their age was indeterminate. The MRI radiology report noted plaintiff's June 2, 2003 motor vehicle accident but the MRI showed no brain infarct.
7. Plaintiff was transported to Wake Medical Hospital in Raleigh for further treatment. Once at Wake Med, a CT scan of plaintiff's head noted the same acute and subacute blood mixture around the subdural hematomas. The scan also noted a 5mm right-to-left shift in the frontal lobes and a narrowing of the superseller cistern. On August 9, 2003, after consulting with neurosurgeon Dr. Russell Margraf, plaintiff underwent a right frontal craniotomy for evacuation of the right-sided acute and subacute subdural hematoma. Dr. Margraf's surgical report notes a "considerable amount of dark clot and crank case oil fluid under pressure is evacuated." A drain was placed in plaintiff's head and he was transferred to the Neurological ICU.
8. Dr. Margraf's opinion to a reasonable degree of medical certainty was that plaintiff's subdural hematomas were related to the head trauma plaintiff sustained during his June 2, 2003 motor vehicle accident. Plaintiff's subdural hematomas were over the frontal and parietal lobes at the convexity on the surface of the brain, which were directly over the brain contusion seen on the June 2, 2003 CT scan. The blood Dr. Margraf drained from around plaintiff's brain contained dark clot and what neurosurgeons describe as "crank case oil." This signifies old blood and a chronic or older subdural hematoma, at least two weeks or older. Although he stated the age of the subdural hematomas could not be exactly determined, Dr. Margraf felt it was possible that they were as old as two months. Dr. Margraf's opinion was that plaintiff's subdural hematomas and resulting brain shifting caused the deterioration in function that plaintiff experienced during late July and early August of 2003, prior to his admission to Wake Med.
9. Based upon a review of plaintiff's medical records, neurologist Dr. Mitchell Freedman opined that plaintiff's subdural hematomas were more likely than not caused by the head trauma he sustained during his June 2, 2003 motor vehicle accident, assuming there is no other history of head injuries. According to Dr. Freedman, plaintiff's medical records did not indicate any other specific head injuries of sufficient magnitude to negate his opinion as to the cause of plaintiff's subdural hematomas. Dr. Freedman also stated that plaintiff's deterioration in function during late July and early August of 2003 was caused by his subdural hematomas, specifically, the gradual onset of symptomatic subdural hematomas and resulting pressure on the surface of the brain and motor nerves.
10. At his deposition, Dr. Deochand testified that he could not determine the cause of plaintiff's subdural hematomas to a reasonable degree of medical certainty. However, Dr. Deochand stated that for the elderly, head trauma is the most typical reason for the development of subdural hematomas. When asked to review plaintiff's medical history and recall from his own memory, Dr. Deochand could only cite one instance of head trauma suffered by plaintiff; the June, 2003 motor vehicle accident. Dr. Deochand was again asked whether his records or memory reflected any other instance of head trauma suffered by plaintiff, other than the motor vehicle accident of June 2, 2003, and he answered "no." Dr. Deochand then conceded that it was possible that plaintiff's subdural hematomas were caused by the head trauma sustained during the June 2, 2003 motor vehicle accident. According to Dr. Deochand, when plaintiff presented to him on August 2, 2003 with weakness and pain in his legs and difficulty walking, it was his belief that plaintiff's symptoms were the result of an evolution of his stroke. However, in retrospect, Dr. Deochand opined that this deterioration in function was caused by the subdural hematomas. Dr. Deochand stated that plaintiff was unable to work as a result of his subdural hematomas, at least as of August 2, 2003.
11. At his deposition, Dr. Michael was unable to differentiate whether plaintiff's right-sided facial numbness and weakness in the left upper extremity were related to his bleeding or the stroke. Dr. Michael was unable to give an opinion on the cause of plaintiff's subdural hematomas.
12. The Full Commission finds that the August 9, 2003 surgery performed by Dr. Margraf lessened plaintiff's disability, helped effect a cure to his subdural hematomas, and gave him relief from that condition.
13. On August 10, 2003, plaintiff received a follow-up CT scan, which noted partial evacuation of old and new blood from the right subdural hematoma, with left subdural fluid persisting in mixed attenuation, and the suprasellar cistern was larger. By August 11, 2003, plaintiff's brain drain was removed and he was transferred out of ICU and into therapy. Plaintiff still exhibited mild confusion and remained bedridden after his surgery. Dr. Margraf did not believe that plaintiff was capable of any type of meaningful employment during the entire period Dr. Margraf treated plaintiff.
14. On August 15, 2003, a neurological consult with Dr. Susan Glenn was requested after an onset of hemiballismus of the right lower extremity. Her consult note indicates that plaintiff's right hemiballismus may represent a new stroke or possible sequela of his brain injury from the subdural hematomas. An MRI scan performed on August 15, 2003 was consistent with acute bilateral posterior cerebral artery (PCA) territory strokes. The left PCA stroke was larger than the right. The MRI radiology report by Dr. Martin R. Douglas, a neuroradiologist, states, "Presumably, these abnormalities are the result of uncal herniation and associated compression of the PCAs at the incisura. Resolved bilateral uncal herniation and compression of the basilar cisterns following surgery."
15. In Dr. Margraf's opinion, the most "obvious conclusion" as to the etymology of plaintiff's new stroke and ballistic movements is that the new stroke could be related to the subdural collection and the prior brain shift and ongoing brain pressure. According to Dr. Margraf, "That would be number one on my list." In Dr. Margraf's opinion, plaintiff's subdural hematoma was a significant contributing factor to the stroke plaintiff suffered on August 15, 2003. In his deposition testimony, Dr. Margraf reiterated on cross-examination his belief that plaintiff's August 15, 2003 stroke was significantly related to his subdural hematomas.
16. In Dr. Freedman's opinion, plaintiff's new stroke was not related to plaintiff' subdural hematomas. According to Dr. Freedman, plaintiff's August 15, 2003 MRI film did not indicate the type of compression of the posterior cerebral arteries that could have caused the stroke. However, Dr. Freedman conceded that Dr. Douglas, who Dr. Freedman described as "an excellent radiologist," also reviewed plaintiff's MRI film and prepared a report stating that the pressure from plaintiff's subdural hematomas was being transmitted in a downward direction and compressing the blood vessels leading to the posterior cerebral artery territory in the back of the brain, causing plaintiff's stroke. Dr. Freedman disagreed with this interpretation, but stated that "the real question comes down to . . . does the pressure, which is there, distort the posterior circulation enough to cause the posterior cerebral arteries to have infracted." He acknowledged that although that was not his opinion, such a scenario was possible and that other neuroradiologists or neurologists may disagree with him. Dr. Freedman stated that it was fair to say that because of the new stroke, plaintiff never fully recovered from his subdural hematomas and the stroke compromised the treatment of his subdural hematomas.
17. Plaintiff's condition continued to deteriorate, and, on August 18, 2003, plaintiff was transferred for intensive rehabilitation to improve his function. Upon admission, plaintiff was unable to follow commands or speak intelligibly. Plaintiff continued rehabilitation at Wake Med until September 5, 2003, when he was discharged to Laurels of Chatham, a long-term care facility in Pittsboro, North Carolina. At the time of his discharge from Wake Med, plaintiff had made minimal rehabilitative gains and had communication and cognitive deficits. Plaintiff was unable to eat enough to maintain adequate nutrition, requiring placement of a gastric feeding tube. He was oriented to person only and exhibited severe attention and short-term memory deficits. Plaintiff required assistance for bed mobility and was dependent on barriers and a wheelchair for propulsion. He required assistance for feeding, grooming, upper and lower body care, and toilet and shower transfers. Plaintiff was prescribed Dilantin to prevent seizures, Thorazine to control his ongoing hemiballistic movements, and protective boots on his lower extremities to protect his skin from damage secondary to the involuntary movements.
18. Plaintiff's medical condition improved since his discharge from Wake Med. At the time of the Deputy Commissioner's hearing, plaintiff was able to talk and walk with assistance and could feed and groom himself. However, plaintiff could not drive, continued to suffer from severe attention and memory deficits, and maintained involuntary leg movements.
19. Dr. John Corey of Pittsboro Family Practice has treated plaintiff since he was admitted to Laurels of Chatham. During his first examination of plaintiff, Dr. Corey found plaintiff to be debilitated and physically incapacitated to the extent that it was difficult for him to even get out of bed. Plaintiff also exhibited a severe nervous disorder, including uncontrolled movement of his limbs, inability to walk, and cognitive and speech problems. Over the course of his treatment, Dr. Corey has seen an improvement in plaintiff's condition. Plaintiff is now able to walk and speak. His cognition remains "less than normal," but considerably improved from his first visit. Plaintiff's word-finding skills and memory remain limited and he still has involuntary movements in his legs. Plaintiff continues to complain of frequent headaches. According to Dr. Corey, plaintiff's condition is not unusual for patients who have suffered closed head injuries.
20. In Dr. Corey's opinion, plaintiff is unable to work and is completely, permanently disabled as a result of his medical problems, particularly his cognitive impairment and involuntary leg disorder. Dr. Corey stated that plaintiff has been totally disabled since his first visit with him on September 5, 2003, and that his opinion regarding plaintiff's total disability is unlikely to change in the future. In the past, Dr. Corey has treated patients of a similar age as plaintiff who have also suffered head trauma, subdural hematomas, introcranial pressure on the brain, with a surgical drain to relieve that pressure. Even absent a subsequent stroke after such surgery, Dr. Corey testified that none of those patients ever regained an ability to work.
21. The Full Commission gives greater weight to the testimony of Dr. Margraf and Dr. Freedman than to Dr. Deochand, concerning the causal relationship of plaintiff's subdural hematomas to his June 2, 2003 injury by accident. The Commission also gives greater weight to the expert opinions of Dr. Margraf, who stated that plaintiff's subdural hematomas were a significant contributing factor to his August 15, 2003 stroke, and to Dr. Corey who felt plaintiff was permanently and totally disabled from work since he first treated plaintiff.
22. Based on the greater weight of the medical evidence, the Commission finds that plaintiff's subdural hematomas, resulting medical problems, functional deterioration, and disability are all related to the June 2, 2003 motor vehicle accident that arose out of and in the course of plaintiff's employment. In addition, plaintiff's subdural hematomas and resulting brain shift and pressure were a significant contributing factor in plaintiff's August 15, 2003 stroke. As the result of the injury by accident and resulting conditions, plaintiff was disabled from any employment beginning June 3, 2003 and continuing through the present.
23. Defendant-employer never contacted plaintiff after his accident regarding returning to any type of employment, nor did defendant-employer make any efforts to return plaintiff to any employment or locate suitable employment for him. In fact, defendant-employer sent plaintiff a letter several months after his accident informing him that he had been terminated from his employment effective June 3, 2003.
24. This matter was appealed to the Full Commission by defendants from an Opinion and Award awarding benefits and results in the affirmation of that award.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order for an injury to be compensable under the Workers' Compensation Act, it must be the result of an accident arising out of and in the course of employment. N.C. Gen. Stat. § 97-2(6). An injury arises out of employment "when it occurs in the course of employment and is a natural and probable consequence or incident of it, so that there is some causal relation between the accident and the performance of some service of employment." Taylor v. Twin City Club, 260 N.C. 435, 438,132 S.E.2d 865, 868 (1963).
2. The courts have held that if an employee's idiopathic condition is the sole cause of an injury, the injury does not arise out of the employment. Vause v. Farm Equipment Co., 233 N.C. 88, 92-3,63 S.E.2d 173, 176 (1951). However, an injury arises out of the employment if the employee's idiopathic condition combines with "risk(s) attributable to the employment" to cause the injury. Hollar v. Furniture Co.,48 N.C. App. 489, 496, 269 S.E.2d 667, 672 (1980). It is not required that the "risk attributable to the employment" is a risk greater than that experienced by the public in general. Allred v. Allred-Gardner,Inc., 253 N.C. 554, 117 S.E.2d 476 (1960). "If the employment 'aggravated, accelerated, or combined with the [employee's pre-existing] disease or infirmity to produce' the injury, that injury arises out of the employment. Mills v. City of New Bern, 122 N.C. App. 283, 285,468 S.E.2d 587, (1996) (citing 1 Arthur Larson, The Law of Workmen'sCompensation § 12.21). An award of compensation has been upheld by the courts when the cause of the injury is unexplained or unknown and the injury arose out of and in the course of employment. Robbins v. HosieryMills, 220 N.C. 246, 248, 17 S.E.2d 20, 21 (1941); Janney v. J.W. JonesLumber Co., 145 N.C. App. 402, 550 S.E. 2d 543 (2001).
3. In the case at bar, the parties stipulated that on June 2, 2003, plaintiff was operating a motor vehicle in the course of his employment as a part-time automotive parts delivery person. After suffering what the medical records speculate was a "syncopal episode" or blackout, plaintiff's truck ran off the road, hit a light pole, and flipped over, resulting in plaintiff's closed head injury. The hazards or risks incidental to plaintiff's employment were a contributing proximate cause of plaintiff's accident and resulting injuries. The risk of driving a truck aggravated, accelerated, or combined with plaintiff's pre-existing condition to produce his injury. Rackley v. N.C. Dep't. of Health Human Servs., 153 N.C. App. 475, 570 S.E.2d 121 (2002). Thus, plaintiff's injuries arose out of and in the course of his employment, as they were the result of his June 2, 2003 work-related accident. N.C. Gen. Stat. § 97-2(6).
4. As the result of the compensable injury by accident on June 2, 2003, plaintiff was disabled and has been unable to earn wages in any employment. Plaintiff has shown by the greater weight of the medical evidence that he was disabled immediately after his accident, and that he remains disabled. Defendants failed to provide any evidence to show that suitable jobs were available for plaintiff and that plaintiff was capable of obtaining one of these jobs, taking into consideration plaintiff's physical and mental limitations. Demery v. Perdue Farms,Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
5. Plaintiff's disability and inability to earn wages in any employment is not likely to change in the foreseeable future. Thus, plaintiff is entitled to total disability benefits retroactive to June 3, 2003 as a result of the disability stemming from his June 2, 2003 motor vehicle accident, his subdural hematomas and his August 15, 2003 stroke. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to payment of medical expenses incurred or to be incurred as a result of the motor vehicle accident of June 2, 2003, including follow-up treatment, treatment for his subdural hematomas, and treatment after his August 15, 2003 stroke. N.C. Gen. Stat. §§ 97-2(19),97-25, 97-25.1.
7. Plaintiff's counsel submitted an affidavit showing seven hours spent on the appeal to the Full Commission. Plaintiff is entitled to a reasonable attorney's fee assessed against defendants in the amount of $1,050.00 pursuant to N.C. Gen. Stat. § 97-88.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney fee approved below, defendants shall pay plaintiff total disability benefits at the rate of $101.65 per week beginning June 3, 2003 and continuing until plaintiff returns to work or until further order by the Commission. Any accrued amount shall be paid in a lump sum.
2. Defendants shall pay for plaintiff's medical expenses incurred or to be incurred as result of plaintiff's June 2, 2003 motor vehicle accident including follow-up treatment after the accident, any treatment from Dr. Deochand and Dr. Michael, treatment for his subdural hematomas, including any and all expenses incurred at Central Carolina Hospital and Wake Med during August 2003, treatment for his August 15, 2003 stroke, any and all rehabilitative care following plaintiff's surgery at Wake Med, plaintiff's stay at Laurels of Chatham, and related treatment received from Dr. Corey, so long as such a examinations, evaluations and treatments tends to effect a cure, give relief or lessen his period of disability.
3. A reasonable attorney fee of 25% of the accrued compensation due plaintiff under paragraph 1 of this Award is approved for plaintiff's counsel and shall be paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be paid directly to plaintiff's counsel.
4. A reasonable attorney's fee of $1,050.00 is approved for plaintiff's counsel and shall be paid by defendants to plaintiff's counsel for the costs of this appeal, pursuant to N.C. Gen. Stat. §97-88.
5. Defendants shall pay the costs of this action.
This 24th day of October 2006.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_______________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER